959 So.2d 549 (2007)
Karen TAYLOR
v.
J.C. PENNEY.
No. 2006-CA-1520.
Court of Appeal of Louisiana, Fourth Circuit.
May 23, 2007.
*551 Charlsey Wolff, Wolff & Wolff, New Orleans, LA, for Plaintiff/Appellee.
Jeffrey C. Napolitano, Juge Napolitano Guilbeau Ruli Frieman & Whiteley, Metairie, LA, for Defendant/Appellant.
(Court Composed of Judge DENNIS R. BAGNERIS, Sr., Judge MAX N. TOBIAS, Jr., and Judge EDWIN A. LOMBARD).
MAX N. TOBIAS, Jr., Judge.
Defendant/Appellant, J.C. Penney, appeals from a judgment in favor of the plaintiff/appellee, Karen Taylor, by the Office of Workers' Compensation. After reviewing the record and applicable law, we affirm in part, reverse in part, and render.
J.C. Penney employed Ms. Taylor as a clerk commencing in 1983. On or about 16 April 2003, while carrying merchandise in the stock room, Ms. Taylor tripped and lost her balance when she stumbled into a packaged featherbed. Ms. Taylor claims that she "jammed" her right leg/hip while attempting to maintain her balance. She also claims to have twisted her back in the process. Ms. Taylor did not report the injury to her employer until 18 April 2003. J.C. Penney requested that she see a physician at Concerta Medical Center. The physician at Concerta referred Ms. Taylor to Gordon P. Nutik, M.D., a board-certified orthopedic surgeon.
Ms. Taylor first saw Dr. Nutik on 7 May 2003, and reported her accident of 16 April 2003. She claimed to have experienced pain immediately after the accident, but continued to work. Dr. Nutik's examination yielded a working diagnosis of a strain about the right hip, but he could not rule out a displaced fracture at the base of the femoral head. Dr. Nutik took an x-ray, which was inconclusive, so he ordered an MRI of the right hip. Ms. Taylor was told to keep working and doing her regular activities.
Ms. Taylor returned to Dr. Nutik on 19 May 2003. She reported the same pain but was still working. Her next visit was on 2 June 2003. She had undergone the MRI of her hip and it revealed a diffused increased intensity in the femoral head; the radiologist could not rule out avascular necrosis or a fracture of the femoral head. At that time, Dr. Nutik placed her on limited weight bearing status with crutches and on a sedentary level of work. He also sent her to physical therapy to learn how to use the crutches.
Dr. Nutik next saw Ms. Taylor on 18 June 2003. She reported that her hip seemed to be getting worse. She also told him that she was also seeing Terry Habig, M.D., also a board-certified orthopedic surgeon, and had seen him before she started to see Dr. Nutik. She reported that Dr. Habig had taken her off work, placed her on sedentary work, and recommended a C.T. scan of her hip. Ms. Taylor now reported some problems sitting on her right buttock. Dr. Nutik discussed the possibility of her having avascular necrosis, or a loss of blood supply to the bone.
Ms. Taylor returned to Dr. Nutik on 14 July 2003. By then she had undergone *552 the CT scan of her hip, which revealed no evidence of fracture. Although Ms. Taylor had been off her hip, she still complained of pain. Dr. Nutik then thought that she at least had a bone contusion as a result of her accident. He thought that she could return to sedentary work and he recommended that she undergo physical therapy for four weeks. He was still considering the diagnosis of avascular necrosis because of the signal changes about the hip. He recommended that the MRI be repeated in one month.
Ms. Taylor returned to Dr. Nutik on 4 August 2003. She was still having problems sitting and stated that she hurt in the groin. She complained that the heating pad used in physical therapy was too heavy; Dr. Nutik thought that this was an exaggerated complaint. Based on a series of normal x-rays, Dr. Nutik did not see any objective evidence to indicate a disability; he though she could continue with the sedentary work being provided by J.C. Penney. When he released her to work in July, he thought she should be able to work an eight-hour day, five days per week. He did not place any restrictions on the number of hours she could work.
Dr. Nutik again saw Ms. Taylor on 27 August 2003, after he had received the results of the second MRI, which were now normal. At this point, his diagnosis was transient osteoporosis, a temporary condition that manifests itself and then goes away. Dr. Nutik explained that the specific cause of transient osteoporosis is unknown, although it is a condition not normally associated with trauma. Most cases last for several months and then go away on their own.
Dr. Nutik saw Ms. Taylor on 17 September, 8 October, 5 November, and 17 December 2003. He had not seen her since that last date. He thought that she had returned to the care of Dr. Habig. Up until the last visit on 17 December, no objective findings existed in Ms. Taylor to explain the continued pain in her leg/hip. He did look at her lower back initially, but Ms. Taylor did not have any findings relating to her lower back at the initial evaluation. At best, Dr. Nutik opined that she had a muscle injury and it got better. Dr. Nutik could not explain her ongoing complaints, however, he found Ms. Taylor difficult to assess and get to know.
Dr. Habig first saw Ms. Taylor on 30 April 2003 where she denied any history of injury. She reported that she had pain in her right hip and groin for two weeks and that the pain radiated down her right leg. She stated that the pain was constant and made worse with standing and walking. She denied any back pain or numbness in her leg.
Dr. Habig's back exam showed full range of motion and the hip exam showed slight restriction of motion; the neurological and vascular exams were normal. An x-ray of the hip and pelvis did not reveal any abnormalities. Dr. Habig thought she had sciatica, a nerve problem from her back, or possibly a problem in her hip. He suggested that a bone scan be performed.
Dr. Habig contacted Ms. Taylor on 9 June 2003, after a bone scan and M.R.I. had been performed. The scan showed an abnormal femoral head. At this time, he thought Ms. Taylor could have avascular necrosis of the bone, a hip fracture, or infection. The M.R.I. also showed some fluid within the femoral head and neck, and the radiologist thought she might have a nondisplaced femoral neck fracture.
Ms. Taylor saw Dr. Habig on 11 June 2003, when she reported her 16 April 2003 work-related injury. She said that she had been using a walker to keep her weight off her leg and denied any symptoms suggestive of infection. He took additional *553 x-rays of her hip and saw possible changes in the hip femoral head. Although he did not see a fracture, he saw some areas of less density. He thought the most likely diagnoses were avascular necrosis or transient osteoporosis. With transient osteoporosis, the bone will lose some density, cause pain, and then the pain will go away. Dr. Habig ordered some blood tests to rule out infection and a C.T. scan of her hip. Her blood test results were normal. Dr. Habig also recommended that Ms. Taylor be placed on a no-work status because he was concerned about a fracture.
Ms. Taylor did not return to Dr. Habig until March 2004. She reported that Dr. Nutik was also treating her. She had the C.T. scan done while under Dr. Nutik's care; Dr. Habig did not see the results of that test. However, he did see the results of her August 2003 M.R.I.
When Ms. Taylor saw Dr. Habig on 3 March 2004, she said that her C.T. scan had been abnormal and that she was kept on crutches or a walker until September 2003. He examined the repeat M.R.I., which was normal, confirming a diagnosis of transient osteoporosis. When Dr. Habig saw her, Ms. Taylor was using a cane and she complained of some right hip pain in the groin and buttock area, which worsened with weight bearing. Her hip lacked about twenty degrees of full flexion and about the same amount with external and internal rotation. Dr. Habig thought she could perform the sedentary work provided by J.C. Penney. He did, however, believe that she could still be having problems one year after the accident. In addition, he recommended physical therapy three times a week for four weeks. He thought she went to physical therapy for at least part of the time.
Dr. Habig stated that transient osteoporosis does not always present itself with trauma or secondary to a trauma. However, taking into account that it began after the accident, he would have to consider the accident a factor. With regard to the continued stiffness in her hip, Dr. Habig stated that she might require six months of therapy, but that she would eventually recover.
Dr. Habig next saw Ms. Taylor on 12 May 2004. She stated that she had not gone to physical therapy, but had continued to work with increased pain in her hip and buttock area. Due to the increased pain, she was using a cane for walking. X-rays of her hip were again taken; he did not see any abnormalities, but ordered an M.R.I. of her hip and back. He also said again that he thought that physical therapy would be helpful.
Ms. Taylor's next visit was on 23 June 2004. She was still using a cane for walking. An examination of her hip showed a full range of motion, although she complained of some pain in the extreme ranges of motion, with some tenderness about the buttock area. Her back examination also showed a full range of motion with some pain with straight leg raising. Both the neurological exam and hip M.R.I. were normal. The lumbar spine M.R.I., according to the radiologist, had some bulging to the right of the disc at L-4/5 and L-5/S-1. However, Dr. Habig was not as impressed as the radiologist and was not sure of the significance of those findings. He stated that she had a mild abnormality of the disc. While he felt that she should continue working on a modified level, he thought she could work a full-time schedule.
Ms. Taylor last saw Dr. Habig on 21 July 2004 at which time she was still using a cane. She had a full range of motion in her hip and her pain was diminishing at the extreme ranges of motion. The *554 straight leg raising revealed pain at 70 degrees in the right leg but negative to the left to 80 degrees. The neurological exam showed no weakness. Dr. Habig told her that he did not have much to offer as treatment for her hip. He recommended that she see a neurosurgeon and continue with modified work. He believed that whatever pain she was having was not coming from the hip. Dr. Habig was not aware of any medical reason that would prevent Ms. Taylor from arriving at work on time and no orthopedic reason for her to continue using a cane or restrict her activities. Dr. Habig also believed that she needed to become more active and should increase her standing and walking.
Ms. Taylor was seen by a neurosurgeon, Rand M. Voorhries, M.D., who performed a physical exam and reviewed her M.R.I. films, as well as the report from the radiologist. Although the radiologist noted some minor bulges, Dr. Voorhries stated that he "was struck with how normal everything appeared to be." Dr. Voohries found no indication for surgical intervention. As he had nothing to offer to Ms. Taylor, he released her from his care.
Ms. Taylor testified at trial that she worked full time after the accident until 2 June 2003, when Dr. Nutik placed her on sedentary work status. Dr. Habig then placed her on no-work status on 9 June 2003 until her next appointment on 25 June 2003.[1] Ms. Taylor continued to treat with Dr. Nutik, who allowed her to return to work with restrictions on 14 July 2003.[2] Ms. Taylor understood that she was to perform office duties for as many hours as her injuries permitted. Ms. Taylor received two courses of physical therapy, one ordered by Dr. Nutik and the other ordered by Dr. Habig. She also received a course of aqua therapy.
Ms. Taylor admitted that J.C. Penney accommodated her beginning the first week of June 2003, when Dr. Nutik first gave her work restrictions. At first she testified that she could not do the deskwork provided to her because it required twisting.[3] However, under cross-examination, she admitted that she could have performed the work without twisting. She testified that at first she was working only 3 to 4 hours per day because she was not aware that J.C. Penney was offering her more hours. She testified that as soon as she finished organizing the media, they let her go home. She admitted, however, that they did not force her to leave. Later, she also conceded that J.C. Penney clearly advised her that it would find as much work for her as possible. Ms. Taylor, however, claimed that she was in too much pain to work full time. She also admitted that she went to work and left work at whatever time suited her, depending on her physical condition and level of pain. She claimed that Dr. Habig had ordered physical therapy for her on 14 May 2004, but that her employer denied it.
The Office of Workers' Compensation ("OWC") entered judgment in favor of Ms. Taylor, finding that she suffered a work-related injury on 16 April 2003 while in the course and scope of her employment with J.C. Penney. The OWC found that Ms. Taylor's average weekly wage ("AWW") was stipulated to be $463.46, with a corresponding temporary total disability ("TTD") of $308.99.
*555 The OWC held that as a result of the accident, Ms. Taylor was entitled to TTD for the period from 11 June 2003 through 14 July 2003 at the stipulated rate of $308.99 and was entitled to supplemental earnings benefits ("SEBs") from 15 July 2003 until the judgment is modified or a written consent to modify the judgment is signed. The SEBs were awarded because J.C. Penney only offered Ms. Taylor part-time work instead of full-time modified work duty; however, J.C. Penney was entitled to a credit for the wages actually paid. The OWC ordered J.C. Penney to reinstate Ms. Taylor's paid hours of leave that she took in lieu of receiving indemnity payments, with a credit to J.C. Penney against indemnity due for SEBs.
Finally, the OWC assessed a penalty of $2,000.00 and attorney fees of $3,500.00 for J.C. Penney's failure to pay any indemnity benefits and a penalty of $2,000.00 and attorney fees of $2,500.00 for its denial of physical therapy requested by Dr. Habig on 14 May 2004.
J.C. Penney has appealed from the OWC judgment and challenges all aspects of the OWC judgment.
In Dean v. Southmark Construction, 03-1051, p. 7 (La.7/6/04), 879 So.2d 112, 117, the Louisiana Supreme Court stated that "[i]n worker's [sic] compensation cases, the appropriate standard of review to be applied by the appellate court to the OWC's [Office of Workers' Compensation's] findings of fact is the `manifest error-clearly wrong' standard." The Supreme Court further stated that "the findings of the OWC will not be set aside by a reviewing court unless they are found to be clearly wrong in light of the record viewed in its entirety." Id.
After reviewing the testimony of Drs. Nutik and Habig, we find that the OWC correctly held that Ms. Taylor sustained a compensable injury while employed by J.C. Penney. An injured employee is entitled to receive benefits for an injury that arises out of and in the course and scope of her employment. La. R.S. 23:1031(A). In order to recover, the injured employee must establish (1) a work related accident; (2) a disability; and (3) a causal connection between the accident and the disability. Wilkerson v. City of New Orleans Fire Dept., 03-1550, p. 2 (La.App. 4 Cir. 3/3/04), 871 So.2d 375, 377, writ denied, 04-1548 (La.10/1/04), 883 So.2d 992. La. R.S. 23:1021(1) defines an accident as:
[A]n unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration.
The law is well established that an employer takes an employee as it finds him. Barber Brothers Contracting Co. v. Cuccia, 98-0675, p. 3 (La.App. 1 Cir. 4/1/99), 734 So.2d 820, 822, writ denied, 99-1258 (La.6/18/99), 745 So.2d 31. The fact that disease alone might have disabled the employee in its ordinary course of progress is not the inquiry. Duncan v. State, Department of Transportation and Development, 556 So.2d 881, 886 (La.App. 2 Cir.1990). Employers do not "pay for every flare-up;" but they must compensate claimants who prove a disabling aggravation of prior, asymptomatic conditions as a result of an on-the-job injury. Id. at 886-87.
In the instant case, the evidence supports a finding that Ms. Taylor had an accident while in the course and scope of her employment with J.C. Penney, and therefore, a compensable injury. While transient osteoporosis may or may not be *556 caused by trauma, the doctors agree that findings in her M.R.I. suggested a medical condition that later resolved. Dr. Habig focused on the fact that Ms. Taylor was asymptomatic before the accident and symptomatic afterward. Thus, he could not rule out the accident as a cause of Ms. Taylor's injury. The OWC relied on such testimony when making its ruling. We do not that this was clearly wrong or manifestly erroneous.
The record also supports the finding that Ms. Taylor was placed on no-work status from 11 June 2003 through 14 July 2003 as a result of her compensable injury. Therefore, J.C. Penney is required to pay TTD at the stipulated rate of $308.99. We further find that once J.C. Penney had notice that Ms. Taylor was placed on no-work status, it had an obligation under the law to pay TTD. We find no error in the OWC's holding that J.C. Penney must pay a penalty in the amount of $2,000.00 and attorney's fees of $3,500.00 for its failure to do so.
We now address the issue of the SEBs payments ordered by the OWC. Under the provisions of La. R.S. 23:1221(3)(a), an employee is entitled to receive SEBs if the employee sustains a work-related injury that results in an inability to earn ninety percent or more of the average pre-injury wage. Initially, the employee bears the burden of proving by a preponderance of the evidence that the injury resulted in her inability to earn that amount under the facts and circumstances of the individual case. Freeman v. Poulan/Weed Eater, 93-1530, p. 7 (La.1/14/94), 630 So.2d 733, 738.
Once the employee's burden is met, the burden shifts to the employer who, in order to defeat the claim for SEBs, must prove, by a preponderance of the evidence, that the employee is physically able to perform a certain job and that the job was offered to the employee or that the job was available to the employee in his or the employer's community or reasonable geographic region. Id. at p. 1, 630 So.2d 739. The amount of an award of SEBs is based upon the difference between the claimant's pre-injury average monthly wage and the claimant's proven post-injury monthly earning capacity. See La. R.S. 23:1221(3)(a).
To determine if a trial court's finding that an employee has met his initial burden of proving entitlement to SEBs is manifestly erroneous, a reviewing court must examine the record for all evidence that bears upon the employee's inability to earn ninety percent or more of the pre-injury wages. Seal v. Gaylord Container Corp., 97-0688, p. 8, (La.12/02/97), 704 So.2d 1161, 1166.
This court has held that, although it may consider a claimant's uncorroborated testimony of subjective pain concerning what his/her physical limitations might be as a result of that pain, the decision of the court should not be based on claimant's self-serving testimony on the ultimate issue of whether the claimant is able to work. Duhon v. Holi Temporary Services, Inc., 97-0604, pp. 6-7 (La.App. 4 Cir. 10/1/97), 700 So.2d 1152, 1155; see also Scott v. Lakeview Regional Medical Center, 01-0538, pp. 5-6 (La.App. 1 Cir. 3/28/02), 818 So.2d 217, 222, writ denied, 02-1712 (La.10/4/02), 826 So.2d 1127. As this court stated in Duhon:
We are reminded in Banks [v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840 p. 8 (La.7/1/97); 696 So.2d 551, 556] of "the jurisprudential tenet that worker's [sic] compensation is to be liberally construed in favor of coverage," but we are also bound by La. R.S. 23:1221(3)(c)(ii) which provides that the burden on claimant is not a mere preponderance *557 of the evidence, but one of "clear and convincing evidence" where the disability is "solely as a consequence of substantial pain." The legislature obviously recognized the potential for abuse in this area when it enacted this heightened standard of proof.
Duhon, 97-0604 at p. 6, 700 So.2d at 1155. See also, Bethley v. City of New Orleans, 06-0921 (La.App. 4 Cir. 10/18/06), 945 So.2d 738.
The evidence demonstrates that Ms. Taylor was released by her doctors to perform sedentary work on a full time basis on or about 14 July 2003. The doctors testified that they could not find any objective evidence to explain Ms. Taylor's continued complaints of pain. The record also shows that J.C. Penney offered Ms. Taylor forty hours of sedentary work per week. The sedentary work was described to Drs. Nutik and Habig, who both testified that Ms. Taylor was physically capable of doing the work provided by J.C. Penney. Based on the record, therefore, we find Ms. Taylor did not carry her burden of proof and that the trial court erred in awarding SEBs.
The next assignment of error by J.C. Penney concerns the OWC's order that it reinstate the hours of paid leave taken by Ms. Taylor in lieu of receiving indemnity benefits. J.C. Penney contends that the OWC does not have the jurisdiction to make such an order. Of course, while Ms. Taylor argues to the contrary, neither party has cited any authority to the court to support its position.
This court faced a similar issue in Miller v. City of New Orleans, 95-1005 (La.App. 4 Cir. 12/14/95), 665 So.2d 1293, where an employer was trying to take a credit for the employee's accrued annual and sick leave. Therein we stated:
The Supreme Court held that the La. R.S. 23:1225(C) credit constitutes a restriction on an injured employee's right to workers' compensation benefits and must be strictly construed. Cousins v. City of New Orleans, 608 So.2d 978, 981 (La.1992). The court held that section to be inapplicable to a disabled NOFD [New Orleans Fire Department] employee who is eligible for retirement with the same amount of benefits under both a disability benefit plan and a tenure-based retirement benefit plan. The City relies on the Third Circuit's holding in Cormier v. Lafayette Parish School Bd., 508 So.2d 207 (La.App. 3rd Cir.1987) wherein Ms. Cormier's choice to use her sabbatical leave in order to recuperate required reduction of her SEB by the amount of her sabbatical leave earnings.
In the instant case, the City failed to prove the amount paid to Chief Miller as accrued annual and sick leave. However, even if there were evidence of the amount of these payments, they are distinguishable from the sabbatical leave at issue in Cormier. This Court rejected set-off of compensation benefits as sick or vacation days in Blanque v. City of New Orleans, 612 So.2d at 952. The Third Circuit itself rejected extension of Cormier in the context of sick leave. In Lewis v. Malone & Hyde, Inc., 626 So.2d 531, 533 (La.App. 3 Cir.1993), it held:
Because sick leave benefits are not among the enumerated benefits to which an employer is entitled an offset under La. R.S. 23:1225 . . . we affirm the hearing officer's award to Mr. Lewis of benefits for his initial week of disability.
Neither sick leave nor accumulated annual leave are included in the enumeration of statutory set-offs. Applying Cousins' rule of strict construction, we conclude that the hearing officer properly refused to reduce Chief Miller's compensation *558 by the amount, if any, of his accrued annual and sick leave. This assignment of error is without merit.
Id. at p. 10, 665 So.2d at 1298.
In the instant case, Ms. Taylor was forced to take paid hours of leave in order to survive during the time J.C. Penney erroneously denied indemnity benefits. In other words, but for J.C. Penney's arbitrary refusal to pay indemnity benefits, Ms. Taylor would not have used her annual leave. Because it is not entitled to a credit for these payments, and as the workers' compensation scheme is to be liberally construed in favor of benefits, Frith v. Riverwood, Inc., 04-1086, p. 1 (La.1/19/05), 892 So.2d 7, 16 (Weimer, J., concurring in part and dissenting in part), we affirm the ruling of the OWC that J.C. Penney reinstate Ms. Taylor's paid hours of leave that she took in lieu of receiving indemnity payments.
Finally, the OWC assessed a penalty and attorney's fees against J.C. Penney for its alleged failure to authorize physical therapy requested by Dr. Habig on 14 May 2004. After reviewing the record, we find no evidence of a written order or a medical report from Dr. Habig to J.C. Penney advising it of his request. In addition, his deposition testimony is vague on this issue. Therefore, we reverse the award of penalties and attorney's fees in this regard for physical therapy.
Based on the foregoing, we reverse the OWC's award of SEBs and the penalty and attorney's fees for the denial of physical therapy. In all other respects, the judgment is affirmed.
AFFIRMED IN PART; REVERSED IN PART; RENDERED.
NOTES
[1] Ms. Taylor did not return to see Dr. Habig until the following year.
[2] It is undisputed that J.C. Penney has not paid any indemnity benefits to Ms. Taylor.
[3] The deskwork consisted of organizing the "media" from the cash registers. The media are the various receipts, credit slips, coupons, etc., that are taken at the various registers in the store.